KURT S. ODENWALD, Judge
Introduction
Anthony D. Brand ("Brand") appeals from the judgment of the trial court following a jury trial in which he was convicted of multiple felonies. Brand raises three points on appeal. Point One contends that the trial court erred in limiting Brand's cross-examination of a detective regarding his knowledge of the police-identification-lineup policies. Point Two alleges that the trial court abused its discretion by sua sponte providing the jury with the MAI-CR 3d 312.10 instruction (often referred to as the "hammer instruction"). Point Three argues that the trial court erred in entering judgment for the class C felony of stealing instead of classifying the charge as a misdemeanor,
The trial court did not err in restricting Brand's cross-examination of the detective because Brand did not adequately preserve the matter for appeal and, further, because the inquiry was not legally relevant. The trial court did not abuse its discretion by giving the hammer instruction because the jury spent approximately six hours deliberating, the trial court did not know how the jury was split, and the instruction complied with the Notes on Use. Finally, because the enhancement provisions of Section 570.030.3[1] do not apply to the definition of stealing in Section 570.030.1, Brand's felony-stealing conviction must be reversed and remanded for *287 resentencing as a misdemeanor. In all other respects, we affirm the trial court's judgment.
Factual and Procedural History
Victim, a pizza-delivery driver, delivered a pizza to a fairly lit residential area at approximately 11:30 p.m. Victim parked, walked between two vehicles, opened a gate, heard a man say "That's mine[,]" and turned around to see and feel a gun in his face. The man then demanded Victim's money and keys. Victim was able to see the man within his arm's length. The man's face was not concealed. Victim described the man as African-American, wearing all black clothes and a black baseball cap, about 5-foot, 10-inches tall, and a little stocky. The man then drove away in Victim's truck.
Three days later, Victim spotted his stolen truck and contacted the police. The detectives instructed victim to leave the truck at its current location. The detectives set up surveillance to watch the truck, and pursued the truck when someone began driving away. During the pursuit, the detectives laid down spike-strips. The truck drove over the spike-strips, lost control and smashed into a light post. The detectives took Brand and a female passenger into custody after they ran from crashed truck. The detectives found multiple computer tablets in the passenger compartment of the truck with "Office Max" stickers on them. The detectives investigated the local Office Max store and discovered that a theft had just occurred. The next day, police called Victim into the station to view a lineup, where Victim identified Brand as his assailant.
The State charged Brand with (Count I) a class A felony of robbery in the first degree, (Count II) an unclassified felony of armed criminal action, (Count III) a class C felony of stealing over $500, (Count IV) a class C felony of tampering with a motor vehicle, and (Count V) a class D felony of resisting arrest. Brand moved to suppress Victim's identification, alleging that the identification was inherently suggestive. The trial court held a pre-trial hearing, and denied Brand's motion. The case proceeded to a jury trial.
The following testimony relating to the identification was elicited during trial. Detective Timothy Banks ("Det. Banks") oversaw the lineup and chose the lineup participants. Det. Banks selected the participants from persons in custody at the Justice Center. Brand was wearing an all-red outfit during the lineup, obtained from the Justice Center; he was participant number two. Participants number one, three, and four were wearing a red shirt over their regular tops, but not red pants. Det. Banks was not involved in the actual administration of the lineup. On cross examination, Brand inquired whether Det. Banks was "familiar with the policy and protocol about how lineups are to be conducted according to the St. Louis Metropolitan Police Department[.]" The State objected to this question on relevancy grounds. The following conversation occurred at the bench:
COURT: [Defense], we went into this at great length yesterday, if I remember correctly, and [the State] has now finally objected.
In my opinion the procedures of the police department are not relevant for what the jury has to decide. They're only relevant, if at all, for what the Court has to decide in terms of pretrial issues.
So I just want you to understand why I'm going to sustain the objection. Okay?
DEFENSE: Thank you, Your Honor.
If I may, just for purposes of the record, I would request to be permitted *288 to question on this. I think especially in light of the new instruction, all of the factors are to be considered in the reliability of the officers. Isn't that the question? And their credibility is the question.
If they don't even know their own procedures and know what they're doing, I think that's something that the jury needs to know about. I think it's fair game for cross-examination.
COURT: I understand your position. I'll adhere to my ruling.
Detective Phillip Harden ("Det. Harden") acted as a blind administrator during the lineup, Det. Harden met Victim in front of the Justice Center, and advised Victim of general lineup processes. Det. Harden encouraged Victim to wait until he saw all of the lineup participants before making any identification.
Brand cross-examined Det. Harden extensively regarding the lineup procedure. Regarding the general procedures for a lineup, Det. Harden testified that, typically, participants are chosen from the Justice Center prisoners; the goal of the lineup is to find persons who are similar in age, race, skin tone, height, weight, and similarly dressed; the witness or victim typically fills out a lineup-viewing form after the lineup; and protocol requires at least five participants. Regarding the particular lineup here, Det. Harden did not select the participants; a total of four men participated; and Det. Harden did not write a report. Det. Harden also observed the photos of the lineup participants and determined that Brand was the only participant wearing all red clothing. Brand also was the only participant wearing two bracelets, one of which was gold.
Prior to and while viewing the lineup, the detectives did not give Victim information about any particular suspect. Victim observed four persons, sequentially, and Victim requested that each lineup participant say "That's mine." When the detectives brought in participant number two, Victim recognized him immediately, Victim was, without a doubt, certain that participant number two was the man who robbed him. However, Victim viewed all four subjects before identifying participant number two as his assailant. After the lineup was complete, Victim testified that Det. Banks informed him that he had picked one of the persons arrested from his truck. Subsequently, Victim made an in-court identification of Brand as his assailant. The case was submitted to the jury.
The jury began its deliberations at 12:48 p.m. At 3:50 p.m., the jury had reached verdicts on Counts III, IV, and V, but had not yet reached verdicts on Counts I and II. The trial court ordered the jury to deliberate further. At 5:25 p.m., the jury sent a note, stating that "[a]fter continued discussion, the jury remains split with no resolve in sight. What should we do next?" The trial court pondered whether to bring the jury back the next day and give them the hammer instruction. The trial court asked both parties for their input. The State suggested that the trial court either inquire of the jury whether further deliberations would do any good before issuing the hammer instruction, or release the jury for the night and resume deliberations in the morning. Brand requested a response to the jury encouraging further deliberation. The trial court terminated the jury's deliberations for the night, and scheduled deliberations to resume the next morning:
COURT: At that time, however, it is my intention to give the so-called hammer instruction because I think the jury has signified a deadlock and they've been out for four and a half plus hours-almost four and a half.
DEFENSE: Your Honor, for purposes of the record, I would just *289 make an objection to reading them the hammer unless-well, under any circumstances, but certainly not unless they write us another letter saying that they're still deadlocked.
The next morning over Brand's objection, the trial court gave the hammer instruction to the jury prior to any continued deliberations. The jury then deliberated from 9:32 a.m. until 11:05 a.m. The jury convicted Brand on all five counts. The trial court denied Brand's post-trial motions and sentenced him to a total of twenty-five years in prison. Brand now appeals.
Points on Appeal
Brand raises three points on appeal, In Point One, Brand claims that the trial court erred in precluding his inquiry of Det. Banks's knowledge of the police lineup policies. Brand maintains that Det. Banks's knowledge of the policies was relevant in determining whether Victim made a mistaken identification. In Point Two, Brand alleges that the trial court abused its discretion by sua sponte providing the jury with the hammer instruction. In Point Three, Brand contends that the trial court erred in entering judgment for the class C felony of stealing. Specifically, because the sentencing enhancement factors contained in Section 570.030.3 only apply to "any offense in which the value of property or services is an element," and value is not an element of stealing, Brand argues that he could only have been convicted of a misdemeanor.
Discussion
I. Point One-No Plain Error in Limiting Cross-Examination of Det. Banks
A. Brand Made an Inadequate Offer of Proof
Brand argues that the trial court abused its discretion in precluding him from inquiring about Det. Banks's knowledge of, and adherence to, police policies regarding identification lineups. We first address the State's argument that Brand failed to make an adequate offer of proof preserving his claim for appellate review.
"If an objection to the proffered evidence is sustained, the proponent must then make an offer of proof in order to preserve the record for appeal and to allow the trial court to consider further the claim of admissibility." State v. Peters, 186 S.W.3d 774, 781 (Mo. App. W.D. 2006) (quoting State v. Yole, 136 S.W.3d 175, 178 (Mo. App. W.D. 2004) ). "The purpose of an offer of proof is to insure that the trial court and opposing counsel understand what evidence is being offered and its relevance to the case. The offer should be specific and in sufficient detail to demonstrate its admissibility; mere conclusions of counsel will not suffice." State v. Townsend, 737 S.W.2d 191, 192 (Mo. banc 1987) (internal citations omitted). "An offer of proof must show three things: (1) what the evidence will be; (2) the purpose and object of the evidence; and (3) each fact essential to establishing the admissibility of the evidence." Peters, 186 S.W.3d at 781 (internal quotations omitted).
An appellate court normally does not review evidence excluded by the trial court unless a specific and definite offer of proof was made at trial. The exception to the rule requiring an offer of proof is very narrow and involves a three-part test. First, there must be a complete understanding based on the record of what the excluded testimony would have been. Second, the objection must be to a category of evidence rather than to specific testimony. Third, the *290 record must reveal that the evidence would have helped its proponent.
Id. (internal quotations omitted).
While cross-examining Det. Banks, Brand asked if he was "familiar with the policy and protocol about how lineups are to be conducted according to the St. Louis Metropolitan Police Department?" The State objected, and the trial court sustained the objection on relevancy grounds. For an offer of proof, Brand stated the following:
If I may, just for purposes of the record, I would request to be permitted to question on this. I think especially in light of the new instruction, all of the factors are to be considered in the reliability of the officers. Isn't that the question? And their credibility is the question.
If they don't even know their own procedures and know what they're doing, I think that's something that the jury needs to know about. I think it's fair game for cross-examination.
Critically, Brand did not inform the trial court what Brand believed Det. Banks's answer to the question would have been. More simply, the offer of proof did not show what the evidence would be. An offer of proof explaining only the purported relevance of the evidence to the case is insufficient to preserve a matter for appellate review. The offer of proof must include the evidence the party seeks to introduce. See Townsend, 737 S.W.2d at 192 ; Peters, 186 S.W.3d at 781. Here, Brand's suggestion that Det. Banks's testimony was relevant to the issue of credibility did not constitute an adequate offer of proof because Brand did not create a record on the excluded testimony, Further, we are unable to discern from the remaining record what Det. Banks's excluded testimony would have been. See Peters, 186 S.W.3d at 781. Thus, the exception to the rule requiring an offer of proof does not apply. See id. We will not review the excluded evidence based solely on Brand's speculation on appeal as to Det. Banks's knowledge of the lineup policy, and that such knowledge would have altered the outcome of the trial. Because Brand did not adequately preserve his claim for appellate review, we may review his allegation only, if at all, under the plain-error standard. See State v. Woods, 357 S.W.3d 249, 254 (Mo. App. W.D. 2012).
B. Plain-Error Review
1. Standard of Review
Rule 30.20[2] authorizes us to review, in our discretion, "plain errors affecting substantial rights ... when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." First, we determine whether or not the claimed error "facially establishes substantial grounds for believing a manifest injustice or miscarriage of justice has resulted." State v. Jensen, 524 S.W.3d 33, 42 (Mo. banc 2017) (quoting State v. Walter, 479 S.W.3d 118, 131 (Mo. banc 2016) ). If not, we should not exercise our discretion to conduct a plain-error review. Id. However, if we conclude that we have passed this threshold, we may proceed to review the claim under a two-step process pursuant to Rule 30.20.
In step one of the plain-error review, we decide whether plain error has, in fact, occurred. State v. Baumruk, 280 S.W.3d 600, 607 (Mo. banc 2009). "[P]lain errors are those which are evident, obvious, and clear." Id. (internal citations omitted). If we find plain error, we must continue to step two-considering whether or not a miscarriage of justice or manifest injustice will occur if the error is left uncorrected.
*291 Id. at 607-08. "Manifest injustice is determined by the facts and circumstances of the case, and the defendant bears the burden of establishing manifest injustice." State v. Baxter, 204 S.W.3d 650, 652 (Mo. banc 2006).
2. No Plain Error
Brand's claim of error emphasizes the relevance of Det. Banks's awareness of the police lineup policies on the suggestiveness of the lineup conducted by the detectives. We are not persuaded that Brand's claim facially establishes substantial grounds for believing that he has been a victim of manifest injustice. Thus, Brand does not meet the initial threshold test and we need not proceed with any Rule 30.20 plain-error review. We, however, ex gratia explain below why the claimed error does not amount to plain error.
The general rule in Missouri is that relevance is two-tier: logical and legal. Evidence is logically relevant if it tends to make the existence of a material fact more or less probable. Logically relevant evidence is admissible only if legally relevant, Legal relevance weighs the probative value of the evidence against its costs-unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness. Thus, logically relevant evidence is excluded if its costs outweigh its benefits.
State v. Anderson, 76 S.W.3d 275, 276 (Mo. banc 2002) (internal citations omitted).
Here, the record shows that Brand questioned Victim and the detectives about the circumstances surrounding Victim's identification, lineup procedures in general, the physical differences between Brand and the other participants, and the alleged suggestiveness of the lineup. Brand took full advantage of his ample opportunities to challenge the lineup and subsequent identification and aggressively argued the suggestiveness of the lineup to the jury, as well as the failure of the lineup to adhere to the lineup policies and procedures.
Det. Banks's personal knowledge of the St. Louis Metropolitan Police Department policy concerning lineup procedures was not legally relevant to the proceedings. Brand already had introduced abundant testimony regarding the potential suggestiveness of the lineup and resulting misidentification. Victim was certain of his identification. The lineup had only four participants instead of the usual five. Victim saw the lineup participants sequentially. Brand was the only man wearing both a red shirt and red pants, without normal clothes underneath. Brand was the only man with two arm bands. Victim was not told anything about the lineup participants before the lineup. Victim was told to wait until he saw all of the participants to make any identification. Although Victim testified that detectives told him he had chosen one of the people arrested out of his truck, none of the detectives claimed to have told Victim anything about the participants.
Given the evidence clearly before the jury regarding the circumstances of the lineup, any further questioning regarding the lineup policy would have been cumulative, caused undue delay, and been a waste of time. See Anderson, 76 S.W.3d at 276. For that reason, the trial court committed no error, plain or otherwise, and no grounds for manifest injustice or a miscarriage of justice occurred. See Woods, 357 S.W.3d at 254. Point One is denied.
II. Point Two-No Abuse of Discretion in Giving the Hammer Instruction
A. Standard of Review
"The length of time that a jury is allowed to deliberate and the decision whether to give the hammer instruction are matters within the trial court's discretion."
*292 State v. Adkison, 517 S.W.3d 645, 649 (Mo. App. W.D. 2017) (quoting State v. Hutson, 487 S.W.3d 100, 112 (Mo. App. W.D. 2016). We review the trial court's conduct for an abuse of this discretion. State v. Carriker, 342 S.W.3d 425, 426 (Mo. App. E.D. 2011). "To demonstrate an abuse of discretion, the appellant must show from the record that the jury's verdict was coerced." Hutson, 487 S.W.3d at 112 (internal quotations omitted). The verdict is considered coerced only "when under the totality of the circumstances it appears that the trial court was virtually directing that a verdict be reached and by implication indicated that it would hold the jury until a verdict was reached." Id. (internal quotations omitted). "The giving of a hammer instruction alone is not coercive under Missouri law." Adkison, 517 S.W.3d at 649 (citing Hutson, 487 S.W.3d at 112 ).
B. No Abuse of Discretion
Brand argues that the totality of the circumstances suggest that the trial court's decision to give the hammer instruction virtually required that a verdict be reached, and further implied that the court would hold the jury until that happened. A trial court may give the hammer instruction when "either the length of deliberation or communication from the jury causes the trial court to believe that the jury is deadlocked." Carriker, 342 S.W.3d at 426 (citing State v. Fassero, 256 S.W.3d 109, 116 (Mo. banc 2008) ). We consider several factors to determine whether giving a hammer instruction is coercive:
(1) [T]he amount of time the jury deliberates before the instruction is given; (2) the amount of time that elapses between the reading of the instruction and the verdict; (3) whether the trial court knows numerically how the jury is split and the position of the majority; and (4) whether the giving of the instruction conforms with the [Missouri Approved Jury Instructions] Notes on Use.
Hutson, 487 S.W.3d at 112. Applying these factors, the record before us does not indicate that the hammer instruction was given under circumstances that coerced the jury's verdict.
First, the jury spent approximately four-and-a-half hours deliberating before the trial court gave the hammer instruction. A lengthy deliberation with communication from the jury that it may be deadlocked indicates that the hammer instruction was necessary to ensure the jury's continued, productive deliberations. See Adkison, 517 S.W.3d at 649-50. Missouri cases have found that shorter periods of time were not coercive. See, e.g., State v. Carriker, 342 S.W.3d 425, 427 (Mo. App. E.D. 2011) (deliberated for three hours before the hammer instruction); State v. Dodd, 10 S.W.3d 546, 553 (Mo. App. W.D. 1999) (deliberated for two hours and forty-seven minutes before instruction); State v. Jackson, 896 S.W.2d 77, 80 (Mo. App. W.D. 1995) (deliberated for two-and-a-half hours before instruction). The four-and-a-half hours spent deliberating demonstrates the necessity of the hammer instruction,
The next factor to consider is the amount of time the jury deliberated after receiving the hammer instruction. Hutson, 487 S.W.3d at 112. Here, the jury deliberated for one hour and thirty-three minutes after the trial court gave the hammer instruction before reaching a verdict. "[I]f the jury further deliberated a considerable amount of time [after receiving the instruction but] before returning a unanimous verdict, that may indicate that the jury followed the instruction and considered and deliberated upon each other's viewpoints." State v. Copple, 51 S.W.3d 11, 15 (Mo. App. W.D. 2001). Other Missouri cases have found that similar or less deliberation post-instruction did not indicate *293 coercion. See, e.g., State v. Williams, 409 S.W.3d 460, 467 (Mo. App. W.D. 2013) (deliberation for one hour and twenty-three minutes after instruction); Dodd, 10 S.W.3d at 553 (deliberation for thirty minutes after instruction). Here, the amount of deliberation time after the trial court read the hammer instruction does not indicate that the jury's verdict was coerced.
Third, although the trial court was informed that the jury was having difficulty arriving at a unanimous verdict, the record contains no evidence that the trial court knew how the jury was split on each of the undecided counts or the majority position of the jurors during deliberations. See Adkison, 517 S.W.3d at 650.
Fourth, there is no evidence in the record before us, and Brand does not argue, that the trial court deviated from the Missouri Approved Jury Instructions nor its Notes on Use. See id. Nor does a comparison between Jury Instruction Number 15 and the MAI-CR 3d 312.10 reveal any variation between the two. The trial court allowed counsel for both parties the opportunity to object to the instruction, on the record. The instructions were numbered, read, and properly submitted to the jury. Further, the trial court noted, on the record, the times that the jury first retired to deliberate, when it gave the hammer instruction, and when the jury returned a verdict.
Although we discourage giving the hammer instruction absent a request from either party, See Carriker, 342 S.W.3d at 427, there is no evidence here indicating that the instruction coerced a verdict. The trial court did not tell the jury that it must reach a verdict and did not imply that it would hold the jury until a verdict was reached. Although the trial court released the jurors for the night, and gave the hammer instruction before deliberations began in the morning, these facts do not support the necessary finding of coercion. The trial court did not abuse its discretion by giving MAI-CR 3d 312.10. Point Two is denied.
III. Point Three- Bazell Violation
Last, Brand argues that the trial court plainly erred when it entered judgment for the class C felony of stealing on Count III. Brand reasons that stealing property or services valued at five hundred dollars or more is not a class C felony because Section 570.030.3 only applies to "any offense in which the value of property or services is an element," and "value" is not an element of stealing under Section 570.030.1.
In State v. Bazell, the Missouri Supreme Court held that the circumstances listed in the pre-2017 version[3] of Section 570.030.3 could not be used to enhance a stealing conviction from a class A misdemeanor to a class C felony. 497 S.W.3d 263, 266-67 (Mo. banc 2016). In State v. Smith, the Court specifically held that, following Bazell, a stealing offense could not be enhanced to a class C felony by operation of Section 570.030.3(1) based on the value of the property at issue. 522 S.W.3d 221, 230 (Mo. banc 2017).
*294 The State concedes that, pursuant to Bazell and its progeny, Brand should not have been convicted of felony stealing in this case. Point Three is granted. Brand's conviction of the class C felony of stealing pursuant to Section 570.030.3 is vacated, as is the sentence imposed for this conviction. We reverse and remand Count III for resentencing as a misdemeanor.
Conclusion
The judgment of the trial court is affirmed in part and reversed and remanded for resentencing regarding Brand's Point Three.
Robert G. Dowd, Jr., P.J., concurs.
Sherri B. Sullivan, J., concurs.

All statutory references are to RSMo (Cum. Supp. 2013).

All Rule references are to Mo. R. Crim. P. (2015).

The 2013 version of section 570.030, which applies to Brand's offense, includes the same language limiting the application of Section 570.030.3's enhancement provisions only to offenses "in which the value of property or services is an element." Consequently, the Bazell analysis controls here. As of January 1, 2017, a new version of Section 570.030 took effect, which does not include the key language on which the Bazell decision was premised. Furthermore, the holding in Bazell only applies prospectively and to cases still pending on direct appeal. See State v. Smith, 522 S.W.3d 221, 229 n.8 (Mo. banc 2017) ; State ex rel. Zahnd v. Van Amburg, 533 S.W.3d 227, 229 n.2 (Mo. banc 2017).